**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO. 3:21-CV-00226-DJH-CHL**

**TIFFANY H.,[1]**                                                                          **Plaintiff,**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**                                    **Defendant.**

## REPORT AND RECOMMENDATION

Before the Court is the Complaint filed by Plaintiff, Tiffany H. ("Claimant").  Claimant seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner").  (DN 1.)  This case was referred to the undersigned Magistrate Judge to prepare a report and recommendation.  (DN 15.)  Claimant and the Commissioner each filed a Fact and Law Summary.  (DNs 20, 24.)  Therefore, this matter is ripe for review.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **REVERSED** and that this matter be **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for reconsideration with instructions to conduct additional proceedings to remedy the herein identified defects in the original proceedings.

## I.      BACKGROUND

On or about August 14, 2019, Claimant protectively filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") alleging disability beginning on January 1, 2017.  (R. at 11, 106, 122, 138, 140, 142, 162, 182, 184, 284-96.)  On August 13, 2020, Administrative Law Judge ("ALJ") Steven Collins ("the ALJ") conducted a hearing on

---

[1] Pursuant to General Order 22-05, the Plaintiff in this case is identified and referenced solely by first name and last initial.

Claimant's application.[2]  (*Id.* at 36-78.)  In a decision dated September 30, 2020, the ALJ engaged in the five-step sequential evaluation process promulgated by the Commissioner to determine whether an individual is disabled.[3]  (*Id.* at 8-29.)  In doing so, the ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.  (*Id.* at 14.)

2.   The claimant has not engaged in substantial gainful activity since January 1, 2017, the alleged onset date.  (*Id.*)

3.   The claimant has the following severe impairments: obesity, systemic mastocytosis, fibromyalgia, myalgias, asthma, postural orthostatic tachycardia, major depressive disorder, panic disorder, and dystonia.  (*Id.*)

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (*Id.*)

5.   [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can lift up to ten pounds occasionally and less than 10 pounds frequently. The claimant can frequently balance and occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. The claimant can never climb ladders, ropes, or scaffolds. The claimant can occasionally reach overhead with the left upper extremity. The claimant can frequently handle and finger with both upper extremities. The claimant can work in environments with no exposures to moving dangerous machinery, frequent exposure to wetness, humidity, and vibrations, but no more than occasional exposure to temperature extremes or pulmonary irritants such as dust, fumes, gases, poorly ventilated areas, and odors. The claimant would be off task no more than ten percent of the workday in addition to normally scheduled breaks and would miss no more than one day of work per month. The claimant would need a cane for ambulation if walking more than ten to fifteen steps. The claimant can perform simple routine tasks and some detailed, but not complex, tasks. The claimant can complete two-hour work segments over an eight-hour workday. The claimant can respond appropriately to occasional contacts with supervisors, coworkers, and the public.  (*Id.* at 17.)

---

[2] At the hearing, Claimant agreed to amend her alleged onset date to July 20, 2018.  (*Id.* at 11, 42-43.)  However, in his numerical findings, the ALJ referenced her original January 1, 2017, alleged onset date despite acknowledging the amendment at the outset of his decision.  (*Id.* at 11, 23.)  As Claimant made no claim of error related to this discrepancy in her Fact and Law Summary, the undersigned will not address the same herein.

[3] The record also contains a decision from ALJ Jerry Lovitt dated July 19, 2018, in which ALJ Lovitt found Claimant not to be disabled.  (*Id.* at 79-98.)  Because ALJ Collins found that Claimant's condition had changed since ALJ Lovitt's decision, the undersigned will not address ALJ Lovitt's opinion herein.  (*Id.* at 11-12.)  All further references to "the ALJ" herein should be construed to refer to ALJ Collins.

6.      The claimant is unable to perform any past relevant work.  (*Id.* at 21.)

7.      The claimant . . . [wa]s a younger individual age 18-44, on the alleged disability onset date.  (*Id.*)

8.      The claimant has at least a high school education.  (*Id.*)

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  (*Id.*)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there have been jobs that exist in significant numbers in the national economy that the claimant can perform.  (*Id.* at 22.)

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2017, through the date of this decision.  (*Id.* at 23.)

Claimant subsequently requested an appeal to the Appeals Council, which denied her request for review on February 5, 2021.  (*Id.* at 1-7, 281-83, 406-08.)  At that point, the ALJ's decision became the final decision of the Commissioner.  *See* 20 C.F.R. § 422.210(a) (2021); *see also* 42 U.S.C. § 405(h) (discussing finality of the Commissioner's decision).  Pursuant to 20 C.F.R. § 422.210(c), Claimant is presumed to have received that decision five days later.  20 C.F.R. § 422.210(c).  Claimant timely filed this action on April 9, 2021.  (DN 1.).

## II.    DISCUSSION

The Social Security Act authorizes payments of DIB and SSI to persons with disabilities. *See* 42 U.S.C. §§ 404-434, 1381-1383f.  An individual shall be considered "disabled" if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a) (2021).

A.      **Standard of Review**

The Court may review the final decision of the Commissioner but that review is limited to whether the Commissioner's findings are supported by "substantial evidence" and whether the Commissioner applied the correct legal standards.  42 U.S.C. § 405(g); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  "Substantial evidence" means "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have supported the opposite conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *see Smith v. Sec'y of Health & Hum. Servs.*, 893 F.2d 106, 108 (6th Cir. 1989) (holding that if the Court determines the ALJ's decision is supported by substantial evidence, the court "may not even inquire whether the record could support a decision the other way").  However, "failure to follow agency rules and regulations" constitutes lack of substantial evidence, even where the Commissioner's findings can otherwise be justified by evidence in the record. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

B.      **Five-Step Sequential Evaluation Process for Evaluating Disability**

The Commissioner has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating whether an individual is disabled.  20 C.F.R. §§ 404.1520, 416.920 (2021).  In summary, the evaluation process proceeds as follows:

(1)      Is the claimant involved in substantial gainful activity?  If the answer is "yes," the claimant is not disabled.  If the answer is "no," proceed to the next step.

(2)      Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement[4] and

---

[4] To be considered, an impairment must be expected to result in death or have lasted/be expected to last for a continuous period of at least twelve months.  20 C.F.R. §§ 404.1509, 416.909 (2021).

significantly limits his or her physical or mental ability to do basic work activities?  If the answer is "no," the claimant is not disabled.  If the answer is "yes," proceed to the next step.

(3)     Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1?  If the answer is "yes," the claimant is disabled.  If the answer is "no," proceed to the next step.

(4)     Does the claimant have the residual functional capacity ("RFC") to return to his or her past relevant work?  If the answer is "yes," then the claimant is not disabled.  If the answer is "no," proceed to the next step.

(5)     Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work?  If the answer is "yes," the claimant is not disabled.  If the answer is "no," the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The claimant bears the burden of proof with respect to steps one through four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  However, the burden shifts to the Commissioner at step five to prove that other work is available that the claimant is capable of performing.  *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008).  The claimant always retains the burden of proving lack of RFC.  *Id.*; *Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 392 (6th Cir. 1999).

### C.     Claimant's Contentions

Claimant challenged the ALJ's findings regarding her severe impairments, the Listings, and her RFC.  She argued that the ALJ erred in not addressing her urinary impairment either at step two or in formulating his RFC.  (DN 20-1, at PageID # 1218-20.)  She argued that the ALJ erred by not specifically addressing the 11.00 neurological listings and in his analysis of Listings 12.04 and 12.06.  (*Id.* at 1224.)  As to the ALJ's RFC finding, she also argued that the ALJ misevaluated the opinion evidence of record, misevaluated the evidence regarding her postural orthostatic tachycardia ("POTS") as it relates to her ability to sit, mischaracterized and erred in his

treatment of her daily activities, and erred in relying on her allegedly conservative treatment.  (*Id.* at 1220-32.)  The undersigned will address each of Claimant's arguments below.

### 1.    Urinary Impairment

Claimant argued that the ALJ erred by failing to acknowledge her urinary impairment in either his step two findings or his RFC.  (DN 20-1, at PageID # 1218-20.)  At the hearing, Claimant testified that she has "some issues with going to the restroom."  (R. at 51.)  She indicated that she has interstitial cystitis ("IC"), which causes her to feel like she has a urinary tract infection/bladder infection without the infection.  (*Id.* at 51, 53.)  She testified that this condition causes constant urgency to go, difficulty urinating, and accidental urination.  (*Id.*)  She said that at the time she left her receptionist job, she would sometimes be in the bathroom for an hour due to her condition as she tried to go and was not able to go.  (*Id.* at 52-54.)  She testified that there was no medication for the condition and that her urologist told her she will have to start using a catheter on herself when she uses the restroom.  (*Id.* at 54.)  The ALJ did not discuss Claimant's IC or her urinary problems anywhere in his decision.

Generally, an ALJ's failure at step two to find a particular impairment to be severe does not constitute reversible error so long as the ALJ found that the claimant had other severe impairments and moved on to the other steps prescribed by the regulations.  *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).  *See also Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009).  This is because the determination that an impairment is non-severe does not prevent an ALJ from considering it in his or her assessment of a claimant's RFC; instead, an ALJ is required to consider both severe and non-severe impairments in assessing a claimant's RFC.  *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) (2021).  Thus, "[t]he fact that some of [a claimant]'s

impairments were not deemed to be severe at step two is therefore legally irrelevant." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008); *see also Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) (citing *Maziarz*, 837 F.2d at 244). As such, the undersigned finds that the ALJ's failure to categorize Claimant's IC and urinary impairment as a severe impairment at step two does not alone constitute reversible error. Nonetheless, in Claimant's case, this conclusion does not end the analysis.

The ALJ did acknowledge his obligation to consider "all of the claimant's impairments, including impairments that are not severe" in making his determination of Claimant's RFC. (R. at 13.) He likewise stated at the outset of his RFC determination that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" in making his RFC finding. (*Id.* at 17.) The combination of this boilerplate language and the absence of any discussion or accompanying limitations related to Claimant's IC and urinary impairment in the ALJ's RFC finding constitute implicit findings that Claimant's IC and urinary impairment do not significantly limit Claimant's physical or mental ability to perform basic work activities or affect what Claimant can do in a work setting. 20 C.F.R. §§ 404.1522, 416.922 (2021); 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This boilerplate language and these implicit findings notwithstanding, the undersigned finds that the ALJ erred in failing to discuss Claimant's IC and urinary impairment in his decision.

The administrative record contains conflicting evidence regarding Claimant's IC and urinary impairment. During a May 13, 2016, visit with her primary care provider, Erin B. Bryant, APRN, Claimant reported dysuria, urgency, and urinary incontinence that had been occurring over a few weeks and had worsened in the days before her visit. (R. at 895.) She reported vaginal pain and pressure as well as urgency but denied any vaginal discharge or nocturia. (*Id.* at 896.) Her

lab work "showed blood and wbc and leuks and bacteria." (*Id.* at 895.)  She was assessed to have hematuria and leukocytes in her urine, and her provider prescribed Cipro.  (*Id.* at 897.)  During a July 19, 2017, visit with her primary care provider, her provider documented "UTI symptoms that come back with clean cultures," and her provider sent her for a urology consult to rule out IC.  (*Id.* at 883, 885.)  Claimant admitted hematuria and urinary symptoms during this visit but specifically denied frequency, urgency, dysuria, incontinence, and nocturia.  (*Id.* at 884.)  Consistently, in September 2017, Claimant reported to her pain management provider that she had been referred to urology as a result of some urinary issues.  (*Id.* at 469.)  The administrative record does not contain any medical records from a urologist dated around that time, but at her next visit with her primary care provider on November 20, 2017, her provider listed Claimant as having a past medical history of microhematuria, urinary frequency, and urinary incontinence.  (*Id.* at 878.)  At a subsequent January 9, 2018, visit with her primary care provider, which reflected the same past medical history, Claimant reported IC though again denied any frequency, urgency, dysuria, incontinence, nocturia, or polyuria.  (*Id.* at 874-75.)  Between January 9, 2018, and October 17, 2019, her primary care provider continued to document Claimant as having a past medical history of microhematuria, bladder disorder, urinary frequency and/or urinary incontinence.  (*Id.* at 668, 836, 841, 846-47, 852, 858, 862, 866, 870.)

On July 24, 2019, Claimant again presented to her primary care provider with trouble urinating.  (*Id.* at 846.)  Claimant indicated that she wanted to discuss getting a referral to urology because she was having trouble emptying her bladder.  (*Id.*)  Claimant reported that she had seen Dr. Cardin before despite no such records appearing in the administrative record.  Claimant admitted urinary retention but denied any frequency, urgency, dysuria, incontinence, nocturia, or polyuria. (*Id.* at 849.)  Her provider referred her to Dr. Cardin.  (*Id.* at 850-51.)  Less than a week

after, at a July 30, 2019, appointment with her cardiologist, Claimant also reported excessive urination.  (*Id.* at 630, 761.)  On August 28, 2019, Claimant saw Dr. Cardin.  (*Id.* at 632-34.) Claimant reported not feeling like she was emptying her bladder well, getting the sensation that she needed to go but only being able to empty a small amount, the need to sit in the restroom for a while, getting up in the night, straining to urinate, and some urgency. (*Id.* at 632.)  She told Dr. Cardin that she thought her mastocytosis was involving her bladder and causing IC.  (*Id.*)  She also indicated that the bladder symptoms had been present six months or so but had worsened such that she was constantly uncomfortable.  (*Id.*)  Dr. Cardin indicated a need to have some testing done and to see Claimant again, but there are no follow up records from Dr. Cardin in the administrative record.  (*Id.* at 634.)  During December 4, 2019; February 4, 2020; and May 4, 2020, visits with another provider, Claimant complained of getting up in the night to urinate, difficulty urinating, and frequent urination but denied any blood in her urine or painful urination; she was also noted to have a past medical history of IC.  (*Id.* at 903-04, 1019-20, 1023-24, 1041, 1052-53.)  Claimant also reported that she had IC during her consultative examination with Dr. Greg Lynch, Ph.D., ("Dr. Lynch").  (*Id.* at 911.)  Claimant reported frequent urination during her visit to the Hardin Memorial Hospital Sleep Center on May 19, 2020.  (*Id.* at 1110.)  Her new allergist, who she saw on June 23, 2020, also noted that Claimant had a past medical history of IC.  (*Id.* at 1101.)  Despite these complaints regarding IC and/or a urinary impairment, throughout the period described above, Claimant denied a number of urinary symptoms in her visits with various providers including denials of frequency, urgency, dysuria/painful urination, incontinence, nocturia, polyuria/excessive urination, hematuria/blood in her urine, and/or changes in her bladder habits. (*Id.* at 108, 413, 424, 432, 439, 446, 455, 515, 522, 526, 530, 534-35, 539, 669, 736, 772, 780-81, 789-90, 797-98, 806, 818, 839, 849, 855, 863, 867, 875, 884, 893, 896, 900, 903-04, 921, 930,

1019, 1023-24, 1041, 1053, 1062, 1067, 1086.)  The record also contains a number of normal findings on imaging of her kidneys.  (*Id.* at 509-10, 833 (noting that a March 3, 2016, abdominal ultrasound showed a normal appearance of her left kidney with no renal cyst, mass, or hydronephrosis); *id.* at 505-06, 831-32 (noting that a March 10, 2016, MRI of her abdomen showed no evidence of solid renal mass or hydronephrosis); *id.* at 497-98 (noting that May 19, 2016, CT of her abdomen and pelvis showed no hydronephrosis, hydroureter, or obstructing renal calculi); *id*. at 748-49 (noting that a December 11, 2018, ultrasound of her abdomen showed normal kidneys with no mass or obstruction).)  Additionally, there is no opinion evidence in the record regarding the effect of Claimant's IC or urinary impairments.

The Commissioner argued that the numerous times that Claimant denied urinary symptoms should outweigh the few complaints made by the Claimant in the record or the instances where providers noted she had a past medical history of certain conditions.  (DN 24, at PageID # 1246.)  And perhaps, *if* the *ALJ* had indicated as much in his decision, it would compel a different result in this case.  However, courts have held repeatedly that a reviewing court's role in determining whether an ALJ's decision is based upon substantial evidence is not to "resolve conflicts in evidence or decide questions of credibility."  *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 253 (6th Cir. 2016) (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012)).  To take the Commissioner's position, the undersigned would have to do just that.  The record contains evidence substantiating Claimant's testimony regarding the limitations caused by her IC/urinary impairment as well as evidence supporting that Claimant suffered lesser limitations than she claimed.  Any conflict was for the ALJ to resolve, not this Court.  Because of the lack of discussion in the ALJ's decision, the undersigned finds that there is simply no basis from which to analyze whether his decision as to Claimant's IC and urinary impairment is supported by substantial

evidence.  Accordingly the undersigned finds that the ALJ erred in failing to discuss Claimant's IC and urinary impairment at either step two or in his RFC determination and will recommended that this matter be reversed and remanded for further proceedings on this issue.

### 2. Listings

Claimant also argued that the ALJ erred in his analysis of the Listings.  At step three of the five-step evaluation process, the ALJ considers whether the claimant has an impairment that satisfies the criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, which are generally referred to as the "Listings."  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  "[A] claimant who meets the requirements of a listed impairment will be deemed conclusively disabled."  *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 653 (6th Cir. 2009).  A claimant's impairment satisfies a Listing only when the claimant manifests the specific requirements described in the Listing's medical criteria.  20 C.F.R. §§ 404.1525(d), 416.925(d) (2021).  To meet the requirements of a listed impairment or its equivalent, a claimant must demonstrate specific findings that duplicate the enumerated criteria of the listed impairment.  *Lawson v. Comm'r of Soc. Sec.,* 192 F. App'x. 521, 529 (6th Cir. 2006); *see also Thacker v. Soc. Sec. Admin.,* 93 F. App'x 725, 728 (6th Cir. 2004) ("When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency.").  The claimant bears the burden of proving his or her impairment satisfies all the specified criteria in a given Listing.  *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990).  Given that there are so many potential Listings, the regulations do not require an ALJ to address every listing in his or her findings.  *Sheeks v. Comm'r of Soc. Sec.,* 544 F. App'x 639, 641 (6th Cir. 2013).  If "the record 'raises a substantial question as to whether [the claimant] could qualify as disabled' under

a listing, the ALJ should discuss that listing." *Id.* (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)); *see also Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014).   A "substantial question" requires the claimant to "point to specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of the listing."   *Smith-Johnson*, 579 F. App'x at 432.  Without such evidence, the ALJ "does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433.

Claimant argued that the ALJ's misevaluation of the opinion evidence of record, which will be discussed in more detail below, caused the ALJ to misevaluate the neurological Listings of 11.00 and Listings 12.04 and 12.06.  (DN 20-1, at PageID # 1224-25.)  The ALJ concluded at step three that Claimant's impairments did not meet the criteria of any of the Listings.  (R. at 14.)  He noted that in making this decision, he "paid particular attention to the listing section 1.00, musculoskeletal impairments[;] 3.00, respiratory disorders[;] 4.00 cardiovascular disorders[;] 7.00, hematological disorder[s;] 11.00 neurological disorders[;] 12.00 mental disorders[;] and 14.00 immune system disorders." (*Id.* at 14-15.)  He proceeded to specifically discuss why the evidence of record did not demonstrate that Claimant met Listings 1.02, 3.03, 4.05, 7.18, 12.04, and 12.06. (*Id.* at 15-17.)  While the Commissioner urged the Court to consider this perfunctory argument waived, the undersigned sees no need to do so because Claimant's argument is patently deficient.  As to the neurological Listings in 11.00, Claimant's brief wholly fails to meet the above standard with respect to these Listings; she neither specifically identified which of the numerous neurological disorders in the 11.00 Listings that she claims she would have met had the ALJ properly evaluated the opinion evidence of record nor pointed to specific evidence demonstrating

she satisfied each of the criteria for that individual Listing.[5]  As to Listings 12.04 and 12.06, all Claimant said was that had the ALJ adopted the findings of Dr. Lynch regarding her limitations in social interaction and stress management, Claimant "may have qualified for a 12.04 or 12.06 mental impairment listing."  (DN 20-1, at PageID # 1224.)  This too falls far short of demonstrating that she meets all criteria of Listings 12.04 or 12.06 as required for the undersigned to find reversible error in the ALJ's Listing analysis.  Accordingly, the undersigned finds that Claimant's arguments regarding the Listings are without merit.

### 3.    RFC

An ALJ's RFC finding is the ALJ's ultimate determination of what a claimant can still do despite his or her physical and mental limitations.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); 20 C.F.R. §§ 404.1546(c), 416.946(c) (2021).  The ALJ bases his or her determination on all relevant evidence in the case record.  20 C.F.R. §§ 404.1545(a)(1)-(4), 416.945(a)(1)-(4).  Thus, in making his or her determination of a claimant's RFC, an ALJ must necessarily evaluate the persuasiveness of the medical opinions in the record and assess the claimant's subjective allegations.  20 C.F.R. §§ 404.1520c, 404.1529, 416.920c, 416.929 (2021).

The Claimant also made a number of challenges to the ALJ's RFC finding, which the undersigned will address below.

### a)    Opinion Evidence

Claimant argued that the ALJ erred in his evaluation of the opinion evidence in the record, including his evaluation of the opinions of consultative examiner ("CE") Dr. Lynch and Claimant's

---

[5] The 11.00 Listings contains individual listings for various disorders including 11.02, epilepsy; 00011.05, benign brain tumors; 11.06, parkinsonian syndrome; 11.07, cerebral palsy; 11.08, spinal cord disorders; 11.09, multiple sclerosis; 11.10, amyotrophic lateral sclerosis; 11.11, post-polio syndrome; 11.12, myasthenia gravis; 11.13, muscular dystrophy; 11.14, peripheral neuropathy; 11.17, neurodegenerative disorders of the central nervous system (e.g. Huntington's disease, Friedreich's ataxia, spinocerebellar degeneration); 11.18, traumatic brain injury; 11.20, coma or persistent vegetative state; and 11.22, motor neuron disorders.  20 C.F.R. Pt. 404, Subpt. P., App. 1 § 11.00.

treating providers Kathryn Francescon, A.P.R.N., ("Ms. Francescon") and Lovegildo Garcia, Jr., M.D., ("Dr. Garcia") by "rel[ying] on inadequate and erroneous grounds to discount these opinions." (DN 20-1, at PageID # 1220, 1220-25.)  The new regulations for evaluating medical opinions are applicable to Claimant's case because she filed her application after March 27, 2017. Pursuant to 20 C.F.R. §§ 404.1520c, 416.920c, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" in the record regardless of its source.[6]  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, an ALJ will evaluate the "persuasiveness" of a medical opinion by reference to the five factors listed in the regulation: supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(a), (c); 20 C.F.R. § 416.920c(a), (c).  The regulations provide that the two most important factors are supportability and consistency and that an ALJ is required to "explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions."  20 C.F.R. § 404.1520c(a), (b)(2); 20 C.F.R. § 416.920c(a), (b)(2).  However, the regulations state that "it is not administratively feasible for [an ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions . . . in [the] case record"; thus, an ALJ is not required to explicitly discuss how he or she weighed the factors of relationship with the claimant,[7] specialization, and other factors.[8]  20 C.F.R. §§ 404.1520c(b)(1)-(2), 416.920c(b)(1)-(2).   Where two medical opinions reach different

---

[6] This language indicates that the new regulation has done away with the controlling weight and other old rules regarding the weight to be ascribed to medical opinions.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2021).

[7] In assessing this factor, the regulations require an ALJ to consider the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship.  20 C.F.R. §§ 404.1520c(c)(3), 416.920c(c)(3).

[8] The regulations provide that an ALJ will consider any "other factors that tend to support or contradict a medical opinion."  20 C.F.R. §§ 404.1520c(c)(5), 416.920c(c)(5).  These factors include, but are not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim," "whether new evidence [ ] receive[d] after the medical source made his or her medical opinion . . . makes the medical opinion . . . more or less persuasive," and whether the medical source has "an understanding of [the] disability program's policies and evidentiary requirements."  20 C.F.R. §§ 404.1520c(c)(5), 416.920c(c)(5).

conclusions but are equally "well-supported . . . and consistent with the record," the ALJ is required to state how he or she considered the other three factors in making his or her decision. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

The Sixth Circuit has not elucidated a specific standard to determine whether an ALJ sufficiently complied with the requirement to "articulate how [he or she] considered the medical opinions" and "explain how [he or she] considered the supportability and consistency factors" under the new regulations. 20 C.F.R. §§ 404.1520c(b), 416.920c(b). *But see Deaner v. Comm'r of Soc. Sec.*, 840 F. App'x 813, 822 (6th Cir. 2020) (White, J. dissenting) (applying the new regulations and finding that "[t]he ALJ did not clearly analyze the supportability and consistency of the state consultants' assessments, as compared to other evidence in the record which supported [the plaintiff]'s claims"). However, district courts applying the new regulations within this circuit consistently apply the articulation requirement literally. *See, e.g.*, *Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 909 (E.D. Mich. Aug. 13, 2021) ("The administrative adjudicator has the obligation in the first instance to show his or her work, i.e., to explain in detail *how the factors actually were applied* in each case, to each medical source. Resorting to boilerplate language to support a finding of unpersuasiveness does not satisfy that obligation." (emphasis in original)); *White v. Comm'r of Soc. Sec.*, No. 1:20-CV-00588-JDG, 2021 WL 858662, at *21 (N.D. Ohio Mar. 8, 2021) ("Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of [her] reasoning."); *Lester v. Saul*, No. 5:20-CV-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom. Lester v. Comm'r of Soc. Sec.*, No. 5:20-CV-1364, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021) (finding that "the [new] regulations do

require that the ALJ clearly explain his consideration of the opinions and identify the evidence supporting his conclusions"). The ALJ's analysis here falls short of meeting this standard.

CE Dr. Lynch found Claimant to have slight limitations on her capacity to understand, remember, and carry out instructions and sustain attention and concentrations towards performance of simple repetitive tasks. (R. at 914.) He also found that Claimant had marked limitations on her ability to tolerate the stress and pressure of day-to-day employment and her ability to respond appropriately to supervision, coworkers, and work pressures in a work setting. (*Id.*) The ALJ found that Dr. Lunch's opinion was "not persuasive as to any marked limitations." (*Id.*) He noted that "[t]he record reflects that the claimant has limited and routine mental health treatment" and criticized that "Dr. Lynch relied on the [C]laimant['] subjective complaints in reaching his conclusions." (*Id.*) That was the totality of his analysis, and he cited no records to support his discussion. This analysis does not specifically tie to any other portion of the ALJ's decision sufficient to offer the Court any meaningful explanation as to why the CE's proposed limitations are unpersuasive. It likewise seems inconsistent with the ALJ's analysis of Claimant's mental health impairments and his indication that he was "[g]iving the [C]laimant every benefit of the doubt." (*Id.* at 19.)

Ms. Francescon noted in her opinion form that Claimant had been diagnosed with systemic mastocytosis, fibromyalgia, POTS syndrome, and dystonia, which were all "lifelong diagnoses." (*Id.* at 1094.) She summarized that Claimant had generalized weakness, difficulty walking, pain at multiple joints, weakness of bilateral hips, osteopenia, dizziness, and POTS syndrome." (*Id.*) In the portion of the form relative to objective signs of Claimant's symptoms, she checked lines for tenderness, muscle weakness, trigger points, impaired sleep, chronic fatigue, significantly reduced range of motion, and "multiple tender joints strength." (*Id.*) She also noted that Claimant

had depression and anxiety.  (*Id.*)  She noted that Claimant should use a cane or other assistance device when engaged in occasional standing and walking.  (*Id.* at 1095.)  She found that Claimant could sit "at intervals" for less than two hours and stand and walk less than two hours in an eight-hour workday.  (*Id.*)  She found that Claimant could frequently lift and carry less than five pounds and occasionally lift and carry five pounds but never a greater weight than that.  (*Id.*)  She found that Claimant could never climb, balance, stoop, crouch, kneel, and crawl.  (*Id.*)  She found that Claimant would need to rest at unpredictable intervals during a work shift as many as three to four times per day for more than thirty minutes each time.  (*Id.*)

Dr. Garcia noted on his form that Claimant had been diagnosed with dystonia musculorum deformans, tremors, and poor memory, for which her prognosis was poor.  (*Id.* at 1096.)  He noted that Claimant suffered from muscle soreness daily and that her symptoms resulted in tenderness, muscle weakness, impaired sleep, morning stiffness, and subjective swelling.  (*Id.*)  He noted that her medications make her tired.  (*Id.*)  He specifically noted that her "muscle jerks, spasms, and tremors affect[ ] her ability to walk."  (*Id.*)  He noted that Claimant had depression and anxiety. (*Id.*)  Like Ms. Francescon, he found that Claimant could frequently carry less than five pounds and occasionally carry ten pounds but never greater weight than that.  (*Id.* at 1097.)  He found that Claimant could never climb, balance, stoop, crouch, kneel, and crawl.  (*Id.*)  He found that Claimant would need unpredictable breaks up to two times a day of more than thirty minutes each. (*Id.*)  He found that she should use a cane or other assistive device while engaging in occasional standing and walking and also completed a separate assistive device medical source statement providing that Claimant needed a cane for ambulation and balance on all surfaces and could only walk ten to fifteen steps without it.  (*Id.* at 1097-98.)  Though the ALJ referred to two statements by Dr. Garcia regarding Claimant's need for a cane, he only provided one source statement; the

other "statement" referred to by the ALJ in the record is Dr. Garcia's actual prescription of a cane to Claimant "re: poor balance, weakness." (*Id.* at 587.)

The ALJ considered Dr. Garcia and Ms. Francescon's opinions together, noting that they "completed check the box forms that indicated the [C]laimant could not meet the basic demands of competitive work."[9] (R. at 21.) The ALJ observed that "[t]hese opinions d[id] not contain a well[-] supported rationale with citation to objective findings in the record." (*Id.*) He indicated that "[t]he findings on examination are essentially mild and within normal limits despite the [C]laimant's subjective complaints of extreme limitations on all activities." (*Id.*) Thus, he found the opinions not persuasive. (*Id.*) He also found Dr. Garcia's separate statements that Claimant required a cane for walking "persuasive to the degree that the claimant requires a cane for ambulation but not balance." (*Id.*) Again, as with Dr. Lynch, the ALJ cited no particular records to support his discussion.

The Commissioner urges the undersigned to accept the ALJ's analysis of the opinion evidence and points to evidence in the record she claims supports the ALJ's analysis, a number of which were not cited by the ALJ in his decision. (DN 24, at PageID # 1252-56.) While this court considers the record as a whole and may look to any evidence in the record—regardless of whether it has been cited by the ALJ—in determining whether an ALJ's decision is supported by substantial evidence, *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) (citing *Walker v. Sec'y of Health & Hum. Servs.,* 884 F.2d 241, 245 (6th Cir.1989), *questioned on other grounds by Cutlip v. Sec'y of Health & Hum. Servs.,* 25 F.3d 284, 286 (6th Cir.1994)), the regulations governing the

---

[9] The ALJ's decision states that "*Dr. Lynch* and Nurse Francascon [*sic*] completed check the box forms." (*Id.* at 21 (emphasis added).) The undersigned finds that the same is a typographical error given that at the end of that sentence, the ALJ cites Exhibits B27F and B28F, which consist of Dr. Garcia and Ms. Francescon's opinions, not Dr. Lynch's opinion, which is found at Exhibit B16F. Additionally, Dr. Lynch provided a narrative report, not a check box form. (*Id.* at 910-15.)

ALJ's analysis of opinion evidence guarantee a claimant "a certain level of process that cannot be discounted by the substantial evidence test alone." *Hardy*, 554 F. Supp. 3d at 908 (citing *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 410 (6th Cir. 2009)). Here, the ALJ's failure to do the required analysis prevents the undersigned from adequately assessing his reasoning. While the ALJ's statements did implicate the required supportability and consistency factors, his conclusory statements did not provide the required level of detail to ensure that both the Claimant and this Court could assess the basis for his decision. This lack of detail is important because here, as in *Hardy*, the ALJ rejected to some degree all of the opinion evidence in the record. *Id.* at 908 ("And where, as here, the record contains no opinion that the ALJ found persuasive which supports the non-disability finding, faithful adherence to the 'articulation' requirement of the new regulations is vital to maintaining the guarantee of the rule of law."). This rejection is also particularly significant because both Ms. Francescon and Dr. Garcia agreed on certain limitations that would have been work preclusive. For example, the ALJ offered little analysis sufficient to explain why the cane prescribed by Dr. Garcia was not also required for balancing as well as walking. The VE testified that use of a cane for balancing would be work preclusive. (*Id.* at 73.) Accordingly, the undersigned finds that that the ALJ's procedural error is not harmless and justifies remand.[10]

---

[10] Under the prior regulations, the Sixth Circuit recognized three situations where an ALJ's procedural error in considering a medical source opinion was harmless. *See Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 438 (6th Cir. 2018). These situations are "(1) where 'a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it,' (2) where 'the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion,' and (3) 'where the Commissioner has met the goal of . . . the procedural safeguard of reasons.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004)). However, " '[a] procedural error is not made harmless simply because [the claimant] appears to have . . . little chance of success on the merits." *Id.* (quoting *Wilson*, 378 F.3d at 547). The undersigned finds that none of three scenarios apply in the instant case. The first scenario does not apply because while check box forms can be insufficient, the check box forms provided in this case did indicate symptomology and diagnoses sufficient to support the opined limitations. The second and third do not apply due to the deficiencies discussed above.

b)      **POTS/Inability to Sit**

Claimant also argued that the ALJ erred in his evaluation of her POTS and her ability to sit.  (DN 20-1, at PageID # 1225-27.)  Claimant testified at the hearing that her POTS causes low blood pressure and that if she sits for long periods of time, she gets very dizzy and her vision goes black.  (R. at 54-55.)  She also testified that the condition causes extreme swelling in her feet and legs such that she has to stand and move around frequently.  (*Id.* at 55.)  The ALJ found Claimant's POTS to be a severe impairment at step two.  (*Id.* at 14.)  In his RFC determination, the ALJ acknowledged Claimant's POTS diagnosis but found that Claimant's condition was managed with medication.  (*Id.* at 19 (citing *id.* at 557-61, 625-35, 1088-93).)  However, he noted "[C]laimant feels dizzy due to this condition so she cannot work around hazards or climb ladders, ropes, or scaffolds."  (*Id.* at 19.)  Claimant argued that the ALJ should have recognized the impact of her POTS on her ability to sit but it is unclear whether that impact is substantiated by the record.

On July 30, 2019, Claimant presented to a cardiologist for "tachycardia and possible POTS."  (*Id.* at 629, 760.)  She reported dizziness on a daily basis "usually when she walks."  (*Id.*)  At the direction of her cardiologist, she underwent a tilt table test on August 8, 2019.  (*Id.* at 560-61.)  She also reported chest pain, palpitations, swelling, and shortness of breath while walking or lying flat.  (*Id.*)  At her September 30, 2019, follow-up visit, her cardiologist indicated that the tilt table test confirmed her POTS diagnosis and that Claimant was started on beta blockers to assist with her symptoms.  (*Id.* at 1088.)  Claimant reported no change in her dizziness due to the medication.  (*Id.*)  She again reported palpitations, swelling, and shortness of breath while walking or lying flat.  (*Id.* at 1088.)  Her cardiologist started her on a different medication, indicating that he might increase it to a higher dose or change the medication depending on Claimant's response to the same.  (*Id.* at 1089.)  At her January 10, 2020, visit to her cardiologist's office, progress

notes document that Claimant complained of a fast heart rate when she gets up and walks and unchanged issues with shortness of breath, which she again indicated was with walking or lying flat. (*Id.* at 1090.)  The nurse practitioner made further changes to Claimant's mediations.  (*Id.* at 1091.)  At a follow up visit on February 10, 2020, Claimant reported the new medication changes "having a remarkable improvement in her symptoms."  (*Id.* at 1092.)  She again reported palpitations, swelling, and shortness of breath while walking or lying flat.  (*Id.*)  Her cardiologist increased the dose of one of her medications but noted the EKG performed while Claimant was in office showed normal parameters.  (*Id.* at 1093.)

While these records substantiate some of Claimant's allegations regarding her POTS and the fact that she was diagnosed with the same, they do not specifically substantiate her claims regarding the interaction between her POTS and her ability to sit.  The mere existence of a diagnosis is insufficient to demonstrate related functional limitations.  *See Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) (citing *Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988)) ("But not every diagnosable impairment is necessarily disabling."); *Kennedy v. Astrue*, 247 F. App'x 761, 767 (6th Cir. 2007) ("[A] mere diagnosis of obesity does not establish either the condition's severity or its effect on [claimant]'s functional limitations.").  There is no opinion from her cardiologist in the record.  Ms. Francescon did note in her opinion that Claimant had a diagnosis of POTS and symptoms of dizziness, and limited Claimant to sitting at intervals for less than two hours in an eight-hour workday; however, her opinion did not necessarily link that limitation specifically to only Claimant's POTS.  (R. at 1095.)  Sedentary work, the level of work to which the ALJ limited Claimant, involves by definition sitting and occasional standing or walking; specifically, it involves approximately six hours of sitting and two hours of walking or standing in an eight-hour work day.  20 C.F.R. §§ 404.1567(a), 416.967(a) (2021); SSR 83-10,

1983 WL 31251, at *5 (Jan. 1, 1983).  Thus, to the extent Ms. Francescon's opined limitations were found persuasive, it would tend to generally support Claimant's allegations regarding her ability to sit, though again, not necessarily due to POTS.  However, given the lack of link in the specific medical records cited above regarding Claimant's sitting and her POTS/POTS symptoms, the undersigned finds that the ALJ's conclusion regarding Claimant's POTS is supported by substantial evidence at this point.  Any error in the ALJ's assessment of Ms. Francescon's opinion is better addressed after remand for the reasons set forth above.

### c)       Daily Activities and Conservative Treatment

The Claimant argued that the ALJ's RFC determination was based on "erroneous and unsupported reasoning pertaining to [her] activities of daily living and allegedly conservative treatment."  (DN 20-1, at PageID # 1227.)  The Commissioner argued that the ALJ reasonably evaluated the Claimant's subjective complaints and treatment.  (DN 24, at PageID # 1256-58.)

Though the regulations omit the term "credibility," they provide that when forming an RFC, an ALJ must assess the claimant's subjective allegations regarding his or her symptoms.  20 C.F.R. §§ 404.1529(a), 416.929(a).  The regulations note that a claimant's statement that he or she is experiencing pain or other symptoms will not, taken alone, establish that he or she is disabled; there must be objective medical evidence that show the existence of a medical impairment that could reasonably be expected to give rise to the pain and/or other symptoms alleged.  *Id.*   If the ALJ finds that there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ must then assess the intensity and persistence of a claimant's symptoms to determine how those symptoms limit the claimant's capacity for work.  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  In doing so, the ALJ should consider a number of factors including a claimant's daily activities; the location, duration, frequency, and intensity of a

claimant's pain or other symptoms; any precipitating or aggravating factors; the type, dosage, effectiveness, and side effects of claimant's medications; and any other measures a claimant may use to alleviate pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929). The regulations only require an ALJ to *consider* the pertinent factors; they do not require the ALJ to discuss all the factors in his or her opinion.  *See Dutkiewicz v. Comm'r of Soc. Sec.,* 663 F. App'x 430, 433 (6th Cir. 2016) ("The ALJ was not required to explicitly discuss [claimant]'s work history when assessing his credibility . . . .").  However, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 81 Fed. Reg. 14166, 14171 (Mar. 16, 2016).

Here, the ALJ relied on Claimant's daily activities and "conservative" treatment to conclude that "[C]laimant's statements about the intensity, persistence, and limiting effects of her symptoms are inconsistent with the objective evidence of record.' (R. at 20.)  As to Claimant's daily activities, the ALJ found that her activities were not as limited as one would expect.  (*Id.*) He summarized,

> At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the [C]laimant's testimony), the [C]laimant reported caring for her personal needs, performing household chores, caring for her child, shopping, reading, coloring, and painting. The [C]laimant says that she spends her days laying in bed reading, watching television, and playing on her telephone. It should be notes [*sic*] that the physical and mental capabilities requisite to performing many of these household tasks and social interactions replicate those necessary for obtaining and maintaining employment.

(*Id.*) He also noted that Claimant's "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." (*Id.*) He concluded that "[o]verall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision." (*Id.*) As to Claimant's treatment, the ALJ noted that she "has not generally received the type of medical treatment one would expect for a totally disabled individual, with relatively infrequent trips to the doctor for the allegedly disabling symptoms and significant gaps in the history of treatment, for treatment that has been essentially routine and conservative in nature." (*Id.*)

Though the Claimant may dispute the ALJ's conclusions, her daily activities and her treatment are two of the required regulatory factors for the ALJ to consider in making his assessment. 20 C.F.R. § 404.1529(c)(3)(i), (iv); 20 C.F.R. § 416.929(c)(3)(i), (iv). Claimant criticized the ALJ for citing nothing from the record to support his conclusions regarding her daily activities and argued that in fact the record contradicts the ALJ's interpretation of her activities. (DN 20-1, at PageID # 1228.) Claimant cited no rule or authority requiring the ALJ to provide all record citations to support his analysis. While the same would certainly simplify matters for a reviewing court, here the ALJ's general description of the types of documents on which he was relying provide a sufficient "citation" for the Court to review the basis for his finding. Claimant points in her brief to examples of instances where she believes the ALJ discounted limitations she described on her daily activities. (DN 20-1, at PageID # 1228.) She also argued that the ALJ improperly played doctor by titling her treatment as "conservative." (*Id.* at 1231.) On balance, the undersigned finds that the ALJ's conclusions regarding her daily activities and treatment are supported by substantial evidence. Though Claimant did cite to testimony not discussed by the ALJ in his decision, an ALJ is not required to provide a written evaluation of every piece of

evidence in the record, be it objective or subjective, in articulating his RFC determination.  *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) (quoting *Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir. 2000)); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand.").  While the ALJ did not specifically discuss the various caveats Claimant put on her daily activities, the same were not universally applied, and the record is inconsistent on some of the points identified by the ALJ.  For example, in describe her daily activities from the time she woke up until bedtime on a function report in the record, Claimant indicated she would watch television and play games on her phone.  (R. at 335.)  It was not until several pages later than she indicated she had trouble focusing for more than ten to fifteen minutes at a time, and she did not specifically link that limitation to her ability to watch television on that form as she did during her hearing testimony.  (*Id.* at 63-64, 339.)  Given inconsistencies like this in the record, the undersigned finds that ALJ's assessment was supported by substantial evidence.  As to Claimant's treatment, Claimant argued that the ALJ's lay interpretation of her treatment as conservative is erroneous given the number of different physicians she saw for her impairments and types of medication she was prescribed.  (DN 20-1, at PageID # 1230-31.)  Though Claimant may disagree with the ALJ's assessment, "[c]ourts acknowledge that an ALJ may discount the claimant's credibility if the claimant received only a mild or conservative course of treatment for an alleged disabling impairment."  *Sadler v. Comm'r of Soc. Sec.*, No. 1:12-CV-1263, 2014 WL 642235, at *8 (W.D. Mich. Feb. 19, 2014) (collecting cases).  Claimant did not provide sufficient authority to dispute that ALJ's characterization of her treatment here.

Because the ALJ discussed her daily activities and her treatment and weighed the same in the context of the other evidence of record using the applicable regulatory factors, the undersigned

finds that the ALJ's analysis of Claimant's subjective complaints was supported by substantial evidence.

## III.   RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that final decision of the Commissioner be **REVERSED** and that this matter be **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner to conduct additional proceedings to remedy the above-identified defects in the original proceedings.

Colin H Lindsay, Magistrate Judge
United States District Court

cc:   Counsel of Record

August 9, 2022

### Notice

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations.  A copy shall forthwith be electronically transmitted or mailed to all Parties.  28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal.  *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).